DREW, J.
In this matter involving a third-party demand for indemnification, defense, and insurance coverage, International Paper Company ("IP") appeals a summary judgment dismissing its claims against L & R Timber Co., Inc. ("L & R").
We reverse the judgment in part, affirm in part, and remand.
BACKGROUND
In April of 2011, IP and L & R executed a "Master Wood Purchase and Service Agreement" ("Agreement") under which L & R agreed to sell, deliver, cut, convert, and/or transport forest products to IP's facilities or other designated destinations for acceptance and/or purchase by IP.
The Agreement required L & R to make IP an additional insured on its Commercial *182 General Liability and Automobile Liability policies. The contract also contained an indemnification clause, which provided:
13. Indemnity: (a) Seller agrees to defend, indemnify, and hold Buyer harmless from and against any and all claims, losses, demands, liens, causes of action or suits, judgments, fines, assessments, liabilities, damages and injuries (including death) of whatever kind or nature, including to all persons or property, arising out of, on account of, or as a result of, directly or indirectly, Seller's or its subcontractors' operations, performance or nonperformance under this Agreement, whether or not caused or alleged to have been caused, in whole or in part, by the negligence of Buyer. Without limiting the generality of the foregoing, Seller specifically agrees to defend Buyer in any suit against Buyer (regardless of whether Seller is also a party to the suit) arising out of, on account of, or resulting directly or indirectly from Seller's or its subcontractors' operations, performance or nonperformance under this Agreement. Seller hereby waives, as against Buyer, any immunity from suit afforded by applicable workers compensation laws.
(b) At Buyer's request, Seller shall provide to Buyer at Seller's expense, a complete defense of any such claim, demand, cause of action, or suit, and Seller shall bear all attorneys' fees; costs of defense; court costs; expert, discovery and investigative fees; and costs of appeal, all to the end that Buyer shall incur no costs or expense of any kind associated with the full and complete defense of any such claim, demand, cause of action or suit, or of enforcing Seller's compliance with this paragraph 13. Seller agrees that Buyer has the right to be represented by separate counsel of its own selection, at Seller's sole expense. Buyer's exercise of its right to select its own separate counsel will in no way diminish or release Seller's obligation to indemnify and hold Buyer harmless.
(c) Except in jurisdictions where prohibited by law, Seller agrees that its duty to defend, indemnify, and hold Buyer harmless is not dependent upon Seller's fault or negligence. Seller's duty to defend, indemnify and hold Buyer harmless exists for each and every claim or suit that arises out of, or in any way relates to, Seller or its subcontractor's operations, performance, or nonperformance under this Agreement. Similarly, except in jurisdictions where prohibited by law, Seller agrees to defend, indemnify and hold Buyer harmless from and against any claim of liability to Seller's employees, and Seller hereby waives any immunity under workers compensation laws to the extent necessary to give effect to this provision.
(d) Seller agrees that its duties and obligations under this paragraph 13 are distinct from, are independent of, and are not intended to be coextensive with, its duty to procure the insurance coverage required by the terms of this Agreement.
On November 20, 2012, L & R and John Daniels entered into a "Logging and Fiber Supply Hauling Contract" under which Daniels agreed to transport forest products and related commodities. Daniels also agreed to assume sole responsibility for unloading his trailers at all destination points.
On May 15, 2013, Daniels drove a truck delivering a load of wood chips for L & R to IP's mill in Mansfield, Louisiana. He asserted that on the instructions of IP's employees, he drove his truck onto a scale, exited his truck, and then went to the scale *183 house to pick up his scale ticket. As he attempted to reenter his truck, the catwalk on which he was required to walk collapsed, causing him to land on his knees and sustain injuries to his knees and lower back.
Daniels filed suit against IP on April 9, 2014. He argued that the catwalk was in the care, custody, and control of IP, that IP knew or should have known of the defective condition of the catwalk, and that IP failed to exercise reasonable care by failing to inspect and repair it. He asserted that IP was liable for his damages in accordance with La. C.C. arts. 2315, 2317, and 2317.1.
On April 6, 2015, IP filed a third-party demand against L & R in which it asserted that under the terms of the Agreement: (i) IP was to be an additional insured on the Commercial General Liability and Automobile Liability policies maintained by L & R; (ii) L & R was to indemnify IP against Daniels' claims; and (iii) L & R agreed to provide IP with a complete defense against Daniels' claims.
L & R filed an exception of prematurity against the third-party demand. It also filed an incidental demand against Daniels, asserting that the contract between Daniels and L & R contained a provision that Daniels agreed to indemnify and hold L & R harmless from any and all claims resulting from Daniels' operations. The exception of prematurity was denied.
On May 6, 2016, IP amended its third-party demand to allege that L & R had breached its obligations under the Agreement to provide a defense to IP against Daniels' claims and to name IP as an additional insured on its policies. IP contended that even though L & R obtained an endorsement to its CGL policy listing IP as an additional insured, L & R did not obtain the specific coverage required by the agreement.
IP also filed a third-party demand against Security National Insurance Company ("Security"), L & R's liability insurer. IP alleged that under the CGL policy, Security had a duty to defend and indemnify IP, as an additional insured, for the alleged damages in Daniels' suit.
Security filed an answer and affirmative defenses in response to IP's third-party demand. Security denied that IP was named an additional insured under the policy. Among Security's defenses was that it did not owe IP a defense or indemnity under the policy because IP was not a named insured or named additional insured, or otherwise qualified as an additional insured following a change endorsement effective December 9, 2012.
L & R filed a motion for summary judgment against IP's third-party demand. L & R contended that because most of the wood harvested was from Texas, Texas law should be used to interpret the Agreement. L & R argued that the indemnification provisions did not meet the fair notice requirements under Texas law. L & R also argued that if Louisiana law applied, the Agreement should be deemed unenforceable as a matter of law as a contract of adhesion because it was created without L & R's input, contained very small print, and put L & R in the disadvantageous position of being required to sign the contract without a meeting of the minds or lose the business opportunity. Finally, L & R contended that it did not intend to indemnify IP against liability arising from premises defects on IP's property over which L & R had no care, custody, or control.
IP filed an opposition to the motion for summary judgment as well as its own cross-motion for summary judgment. L & R filed an opposition to IP's cross-motion for summary judgment.
*184 The trial court granted L & R's motion for summary judgment, denied IP's cross-motion for summary judgment, and dismissed IP's third party demand against L & R. The court stated that all other issues raised in the third-party demand and cross-motion for summary judgment were moot.
Applying Louisiana law, the trial court concluded that it needed to determine the intent of the parties because the words of the Agreement did not appear to be clear and explicit regarding premises liability. After reading the Agreement as a whole, the court found that there was no indication that L & R intended to indemnify IP for its premises liability. The court noted that the Agreement used general and broad terms to describe what was covered, and did not specifically provide for IP's premises liability. The court considered that IP and L & R could have included specific language and an express provision if they intended to include indemnification for premises liability, and there was no sign that L & R unambiguously consented to indemnify IP for IP's premises liability.
The court also stated that even if the Agreement was clear and explicit, enforcement of the indemnity provision to cover premises liability would be an absurd consequence as it would flip the equitable nature of indemnity. Finally, the court concluded that the alleged injury did not arise out of L & R's performance under the Agreement because L & R's performance was to sell and deliver the wood to IP, while IP's performance was to scale or weigh the wood that was delivered. L & R had no control over the scaling and weighing process, and L & R's performance had already been completed when the scaling and weighing process occurred. Thus, according to the court, Daniels' injuries were the consequence of IP's performance under the Agreement, not L & R's performance. The court considered all other issues raised in the third-party demand and cross-motion for summary judgment to be moot.
IP appealed.
DISCUSSION
A summary judgment is reviewed on appeal de novo , with the appellate court using the same criteria that govern the trial court's determination of whether summary judgment is appropriate, i.e. , whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law. Samaha v. Rau , 2007-1726 (La. 2/26/08), 977 So.2d 880.
Interpretation of a contract is the determination of the common intent of the parties. La. C.C. art. 2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050. The words of a contract must be given their generally prevailing meaning. La. C.C. art. 2047.
Choice of law
Although the trial court analyzed the Agreement under Louisiana law, L & R argues that Texas law applies because the Agreement provided that the governing law is the state where the wood was harvested. A choice of law provision in a contract is presumed valid until it is proved invalid. Barnett v. American Const. Hoist, Inc. , 2011-1261 (La. App. 1 Cir. 2/10/12), 91 So.3d 345.
In his affidavit submitted in support of L & R's motion for summary judgment, Ricky Lout, the president of L & R, testified *185 that approximately 98% of the wood delivered to IP pursuant to the Agreement had been harvested in Texas.
IP submitted excerpts from Lout's deposition in opposition to L & R's motion for summary judgment and in support of its own motion. Lout testified that it was not possible to tell which woodchips belonged to whom after the wood came into his mill. He thought it would be impossible to know if the woodchips came from someone who harvested in Arkansas, Louisiana, or Texas.
L & R attached additional excerpts from Lout's deposition in support of its own motion for summary judgment and in opposition to IP's motion. Lout testified that his affidavit was based on his personal knowledge, and that he obtained the 98% figure from L & R's computer system, which showed the source of the wood.
La. C.C. art. 3540 allows contracts to be governed by the law expressly chosen or clearly relied upon by the parties. That choice is given effect except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under La. C.C. art. 3537.
La. C.C. art. 3537 provides the general rule that a contract is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue. It further states:
That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.
La. C.C. art. 3515 provides:
Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.
The choice of law provision in the Agreement reads that the governing law of the Agreement is the state where the wood was harvested, not where most of the wood was harvested. In essence, there was no state law "expressly chosen" under these circumstances as apparently more than one state was the source of the timber that was turned into the woodchips that Daniels delivered to IP on behalf of L & R.
Nor was the choice of law implied. We note that Comment (e) to art. 3540 states, in part:
Mode, timing, and scope of the parties' choice. To be recognized under this Article, the contractual choice of law must either be express or implied. It is express when it is literally declared in the contract; it is implied when, on the basis of the surrounding circumstances, especially the provisions of the contract or *186 the conduct of the parties, it is evident that the parties have clearly relied upon the law of a particular state. An implied choice is distinguished from a hypothetical choice. The latter is not recognized by this Article.
The parties may, of course, choose the applicable law after the conclusion of the contract and may modify a choice made earlier. The parties may also choose more than one law to govern their contract. For example, in a contract that is to be performed in more than one state, the parties may provide that details of performance are to be governed by the law of the state in which performance is to take place.
Where the timber was harvested does not even directly relate to L & R's performance under the contract as L & R's obligation was to "sell, deliver, cut, convert, and/or transport ... pulpwood, saw timber, in-wood chips, residual chips, chip mill chips, fiber fuel, poles, piling or other forest products" to IP's facilities or other designated destinations. Lout testified that L & R buys most of its wood from independent contractors. He explained that he buys the wood, called gate wood, when it comes through his gate.
As recognized by the supreme court in Berry v. Orleans Parish Sch. Bd. , 2001-3283 (La. 6/21/02), 830 So.2d 283, Louisiana public policy disfavors indemnification of a party solely responsible for causation. Barnett , supra . Our legislature has also declared indemnification provisions in certain types of agreements to be invalid. See La. R.S. 9:2780 and 9:2780.1.
Louisiana also has a strong relationship to the parties and the dispute. The Agreement was returned to IP's representative in Louisiana after Lout signed it. The plaintiff and his wife are both domiciled in Louisiana. The accident took place at IP's facility in Louisiana. We also note that L & R is attempting to use a Louisiana law, La. R.S. 9:2780.1, to invalidate the indemnification provision.
Based on the foregoing, we conclude that the trial court properly applied Louisiana law to examine the indemnification provision.
Coverage of the indemnification provision
In Perkins v. Rubicon, Inc. , 563 So.2d 258, 259 (La. 1990), the supreme court held that an indemnity contract will not be construed to indemnify an indemnitee against losses resulting through his own negligent acts unless this intention is expressed in unequivocal terms:
A contract of indemnity whereby the indemnitee is indemnified against the consequences of his own negligence is strictly construed, and such a contract will not be construed to indemnify an indemnitee against losses resulting to him through his own negligent acts unless such an intention is expressed in unequivocal terms. Soverign Ins. Co. v. Texas Pipe Line Co. , 488 So.2d 982 (La. 1986) ; Polozola v. Garlock , 343 So.2d 1000 (La. 1977). The indemnity agreement here unequivocally states that B & B "shall indemnify and hold [Rubicon] harmless from all claims, suits, actions, losses and damages for personal injury, ... even though caused by the negligence of [Rubicon]." As the court of appeal concluded both in the present case and in earlier litigation interpreting the same contract, Reliance Insurance Company v. Barnard & Burk, Inc. , 428 So.2d 1097 (La. App. 1st Cir.), writ denied , 433 So.2d 154 (La. 1983), the parties clearly intended that B & B would assume responsibility for injuries caused by the negligent acts of the employees of Rubicon.
*187 The indemnification provision in the Agreement unequivocally stated that L & R would indemnify IP for even damages caused by IP's own negligence:
[L & R] agrees to defend, indemnify, and hold [IP] harmless from and against any and all claims, losses, demands, liens, causes of action or suits, judgments, fines, assessments, liabilities, damages and injuries (including death) of whatever kind or nature, including to all persons or property, arising out of, on account of, or as a result of, directly or indirectly, [L & R]'s or its subcontractors' operations, performance or nonperformance under this Agreement, whether or not caused or alleged to have been caused, in whole or in part, by the negligence of IP .
Emphasis added.
In support of its determination that the Agreement did not cover indemnification for IP's premises liability, the trial court relied on Soverign Ins. Co. v. Texas Pipe Line Co. , supra . The indemnity provision at issue in Soverign provided that a contractor would indemnify the defendant against any liability, cost, expense, damage, or loss in connection with the contract, except that resulting solely from the defendant's negligence. The defendant was sued after a subcontractor's truck was destroyed when a roadbed on premises leased by defendant collapsed. The supreme court noted in Soverign that there is a presumption the parties do not intend to hold an indemnitee harmless from liability for his own negligence when the contract does not expressly provide for such and an unequivocal intention to so indemnify cannot be found after interpreting the provisions in light of the whole contract. The supreme court then added that this presumption does not apply to the question of whether parties intend to indemnify against an indemnitee's strict liability under La. C.C. art. 2317. The Soverign court found there was an intent to provide for indemnity against the defendant's strict liability under art. 2317 because the contractor represented it had inspected the premises for hazards, and because the contractor promised to take any measures necessary to protect persons and property from injury and loss and to maintain all passageways for the protection of persons and property. The supreme court also noted that the "contract except[ed] from the indemnity provisions only claims ... resulting 'solely from [the defendant's] negligence.' "
Soverign was decided prior to the fundamental changes made to strict liability by the Legislature in 1996. As noted by the supreme court in Burmaster v. Plaquemines Parish Gov't , 2007-2432, p. 2 (La. 5/21/08), 982 So.2d 795, 799 :
Although the plaintiff alleged that PPG is "strictly liable" under La. Civ. Code arts. 2317 and 2317.1, inter alia , this court has recognized that, with its adoption of La. Civ. Code art. 2317.1 to require knowledge or constructive knowledge, "the Legislature effectively eliminated strict liability under Article 2317, turning it into a negligence claim." Lasyone v. Kansas City Southern R.R. , 00-2628, p. 6 (La. 4/3/01), 786 So.2d 682, 689, fn. 9 (quoting Frank L. Maraist & Thomas C. Galligan, Louisiana Tort Law § 14-2, at 330-32 (1996)). Thus, plaintiff's claims under La. Civ.Code arts. 2317 and 2317.1 are not technically strict liability claims.
Because a premises liability claim under art. 2317 is effectively a negligence claim, we conclude that the Agreement's unequivocal provision that L & R would indemnify IP for damages caused by IP's own negligence included the claims made by Daniels that are based on art. 2317 and *188 2317.1. The trial court erred in finding otherwise.
Arising out of L & R's performance
The trial court also erred in concluding that the alleged injury did not arise out of L & R's performance under the Agreement because L & R's performance had already been completed when the scaling and weighing process occurred.
In Perkins , supra , the indemnitor argued that its employee's injury did not arise out of its performance of the contract. The supreme court disagreed, noting that the employee would not have been present at the indemnitee's site to be injured but for the indemnitor's work under the contract.
Likewise, Daniels would not have been standing on the catwalk at IP's facility but for L & R's obligation under the Agreement to deliver woodchips to IP.
Contract of adhesion
L & R also contends that the indemnification provision in the Agreement is unenforceable because it is a contract of adhesion.
"Broadly defined, a contract of adhesion is a standard contract, usually in printed form, prepared by a party of superior bargaining power for adherence or rejection of the weaker party. Often in small print, these contracts sometimes raise a question as to whether or not the weaker party actually consented to the terms. See LSA-C.C. Arts. 1766, 1811 ; S. Litvinoff, 6 Louisiana Civil Law Treatise-Obligations (Book 1), s 194, pp. 346-349 (1969)." Golz v. Children's Bureau of New Orleans , 326 So.2d 865, 869 (La. 1976).
Regarding the concept of a contract of adhesion, in Aguillard v. Auction Mgmt. Corp. , 2004-2804 (La. 6/29/05), 908 So.2d 1, the supreme court cited Professor Saul Litvinoff's Consent Revisited: Offer Acceptance Option Right of First Refusal and Contracts of Adhesion in the Revision of the La. Law of Obligations , 47 La. L. Rev. 699, 757-59 (1986-1987). The court stated, with footnotes omitted:
We note at this time in accordance with Litvinoff's commentary, that contracts of adhesion are usually contained in standard forms. Litvinoff, supra , at 757. Contrarily, although a contract of adhesion is a contract executed in a standard form in the vast majority of instances, not every contract in standard form may be regarded as a contract of adhesion. Id. at 758. Therefore, we are not willing to declare all standard form contracts adhesionary; rather, we find standard form serves merely as a possible indicator of adhesion.
As recognized by Litvinoff, the real issue in a contract of adhesion analysis is not the standard form of the contract, but rather whether a party truly consented to all the printed terms. Litvinoff, supra , at 758. Thus, the issue is one of consent.
Consent is called into question by the standard form, small print, and most especially the disadvantageous position of the accepting party, which is further emphasized by the potentially unequal bargaining positions of the parties. An unequal bargaining position is evident when the contract unduly burdens one party in comparison to the burdens imposed upon the drafting party and the advantages allowed to that party. Once consent is called into question, the party seeking to invalidate the contract as adhesionary must then demonstrate the non-drafting party either did not consent to the terms in dispute or his consent was vitiated by error, which in turn, renders the contract or provision unenforceable.
In summation, a contract is one of adhesion when either its form, print, or unequal *189 terms call into question the consent of the non-drafting party and it is demonstrated that the contract is unenforceable, due to lack of consent or error, which vitiates consent. Accordingly, even if a contract is standard in form and printed in small font, if it does not call into question the non-drafting party's consent and if it is not demonstrated that the non-drafting party did not consent or his consent is vitiated by error, the contract is not a contract of adhesion.
Aguillard , 2004-2804 at pp. 11-12, 908 So.2d at 10-11.
Lout stated in his affidavit that L & R had no input into the provisions of the Agreement and that L & R would not have received the job had it not agreed to the Agreement as drafted by IP. Lout testified that the Agreement was sent to him for review after he negotiated the term and price. He admitted that he did not examine the entire document before signing and returning it to IP.
Lout has negotiated all contracts on behalf of L & R since 1997. He estimated that he executes no more than three wood purchase agreements a year. Besides the three or four agreements that he had negotiated and executed with IP, he had also executed and negotiated woodchip purchase agreements on behalf of L & R with Westrock, Stone Container, Smurfit-Stone, RockTenn, Boise Cascade, Georgia Pacific, Temple-Inland, and Meadwestvaco. Those wood purchase contracts were similar to the Agreement.
While IP and L & R are both commercial enterprises, IP clearly has a more significant commercial presence. L & R also has a history of entering into wood purchase agreements with companies other than IP. Thus, if L & R was dissatisfied with the Agreement terms, then it could have opted to sell its woodchips to another company. Nevertheless, at this stage of the lawsuit, it remains unresolved as to whether L & R was at such a disadvantageous position that it calls into question L & R's consent to an indemnification provision which may be unduly burdensome under these circumstances. Accordingly, a genuine issue of material fact remains regarding whether the Agreement is a contract of adhesion.
La. R.S. 9:2780.1
Finally, L & R argues that the indemnity provision and the insurance coverage provisions were invalidated by the application of La. R.S. 9:2780.1, which reads, in part:
B. Notwithstanding any provision of law to the contrary and except as otherwise provided in this Section, any provision, clause, covenant, or agreement contained in, collateral to, or affecting a motor carrier transportation contract or construction contract which purports to indemnify, defend, or hold harmless, or has the effect of indemnifying, defending, or holding harmless, the indemnitee from or against any liability for loss or damage resulting from the negligence or intentional acts or omissions of the indemnitee, an agent or employee of the indemnitee, or a third party over which the indemnitor has no control is contrary to the public policy of this state and is null, void, and unenforceable.
C. Notwithstanding any provision of law to the contrary and except as otherwise provided in this Section, any provision, clause, covenant, or agreement contained in, collateral to, or affecting a motor carrier transportation contract or construction contract which purports to require an indemnitor to procure liability insurance covering the acts or omissions or both of the indemnitee, its employees or agents, or the acts or omissions of a third party over *190 whom the indemnitor has no control is null, void, and unenforceable. However, nothing in this Section shall be construed to prevent the indemnitee from requiring the indemnitor to provide proof of insurance for obligations covered by the contract.
D. Notwithstanding any contractual provision to the contrary, this Section shall apply to and govern any construction contract to be performed in this state and any motor carrier transportation contract relative to loading or unloading activities, or any services incidental thereto, which occur in this state. Any provision, covenant, or clause in such contracts which conflicts with the provisions of this Section shall be null, void, and unenforceable.
L & R acknowledges that the statute is inapplicable to contracts for transportation of "timber without limitation," but argues that timber was not being transported, and "timber without limitation" is not explained or defined. La. R.S. 9:2780.1(A)(1) states:
(1) "Motor carrier transportation contract" shall mean any contract, agreement, or understanding covering the transportation of property, other than agricultural products as defined in R.S. 9:3306 and timber without limitation, for compensation or hire by a motor carrier, entrance upon property by the motor carrier for the purpose of loading, unloading, or transporting property, other than agricultural products as defined in R.S. 9:3306 and timber without limitation, for compensation or hire, or a service incidental to any such activity, including but not limited to storage of property, other than agricultural products as defined in R.S. 9:3306 and timber without limitation, except the Uniform Intermodal Interchange and Facilities Access Agreement administered by the Intermodal Association of North America or other agreements providing for the interchange, use, or possession of intermodal chassis, containers, or other intermodal equipment.
La. R.S. 9:3306 defines "agricultural products" as, with our emphasis added, "includ[ing] products such as horticultural and dairy products, livestock, wildlife, poultry, bees, forest products , fish and shell fish, and any products thereof, including processed and manufactured products , and any and all products raised or produced on farms and any processed or manufactured products thereof."
Woodchips are an agricultural product under La. R.S. 9:3306. Accordingly, La. R.S. 9:2780.1 does not render the Agreement null, void, or unenforceable.
CONCLUSION
The trial court erred in granting L & R's motion for summary judgment and dismissing IP's claims. However, because a genuine issue of material fact remains regarding whether the Agreement was a contract of adhesion, the trial court correctly denied IP's cross-motion for a summary judgment.
With each party to bear its own costs, the judgment is REVERSED IN PART and AFFIRMED IN PART. The matter is REMANDED to the trial court for further proceedings.
APPLICATION FOR REHEARING
Before DREW, GARRETT, STONE, COX and STEPHENS, JJ.
Rehearing denied.