Judgment rendered April 14, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 53,820-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

GOODRICH PETROLEUM
COMPANY, LLC

Plaintiff-Appellee

versus

COLUMBINE II, LIMITED
PARTNERSHIP, ATLANTIC
RICHFIELD COMPANY, AND
BP AMERICA PRODUCTION
COMPANY

Defendants-Appellants

* * * * *

Appealed from the
Forty-Second Judicial District Court for the
Parish of DeSoto, Louisiana
Trial Court No. 74242

Honorable Amy B. McCartney, Judge

* * * * *

| | |
|---|---|
| BLANCHARD, WALKER, O'QUIN, & ROBERTS, PLC<br>By: W. Michael Adams<br>    William T. Allen<br>    Stacey D. Williams<br>    Timothy R. Wynn | Counsel for Defendants-Appellants, Atlantic Richfield Co. and BP America Production Co. |
| CROWE & DUNLEVY PC<br>By: Harvey D. Ellis<br>    Andrew E. Henry | PRO HAC VICE Counsel for Defendants-Appellants, Atlantic Richfield Co. and BP America Production Co. |

GORDON, ARATA, MONTGOMERY, BARNETT, MCCOLLAM, DUPLANTIS, & EAGAN, LLC.
By: Gregory G. Duplantis
    Samuel E. Masur

Counsel for Plaintiff-Appellee, Goodrich Petroleum Company, LLC

BRADLEY MURCHISON KELLY & SHEA, LLC
By: Malcolm S. Murchison
    Stephen C. Fortson
    Joshua S. Chevallier

Counsel for Defendant-Appellee, Columbine II, Limited Partnership

BREAZEALE, SACHSE & WILSON, L.L.P.
By: Alan H. Goodman
    Thomas M. Benjamin

* * * * *

Before STEPHENS, ROBINSON, and BLEICH (*Pro Tempore*), JJ.

**BLEICH, J. (*Pro Tempore*).**

In this concursus proceeding, the defendants, Atlantic Richfield Company and BP America Production Company ("BP/ARCO"), appeal the trial court's judgment rendered in favor of Columbine II Limited Partnership ("Columbine"). The trial court concluded, *inter alia*, that Columbine is entitled to all overriding royalties attributable to the disputed royalty interest. For the following reasons, we affirm.

## FACTS

Prior to and during the 1980's, ARCO[1] began acquiring numerous properties and royalty interests in multiple states, counties, and parishes in the United States. The interests obtained by ARCO were acquired in various ways, *e.g.*, farmout agreements, assignments, and overriding royalties from predecessor companies. However, some of the information and property descriptions regarding those interests was either incomplete or obsolete, and ARCO chose not to invest the time or money to obtain complete and accurate title searches and property descriptions. At that time, the areas known as the Pettit Formation and the Hosston Formation had been unitized in Northwest Louisiana and were in production; the area now known as the Haynesville Formation had not been unitized and was not in production.

Between 1987 and 1988, ARCO assembled a "royalty package" to advertise, sell, and convey hundreds of royalty/net profit interests in 22 states, counties, and parishes, including Caddo and DeSoto Parishes. ARCO prepared a Royalty Property Sales Brochure ("Brochure") to advertise the properties to potential buyers. The Brochure highlighted the zones and

---

[1] BP is ARCO's successor in interest.

formations that were in production, and it also encouraged potential bidders to consider the "upside potential" from non-producing zones and formations in evaluating the bid prices on the properties.

In 1988, Aviva, Inc. ("Aviva"), a limited partner of Columbine, placed a bid on the royalty package; the bid was rejected. Thereafter, ARCO removed certain properties from the package and revised its Brochure. In 1992, ARCO solicited bids for the approximately 1,500 properties included in the package. Aviva's bid, in the amount of $27.18 million, was accepted. The "Talbert Property" on which the interests in dispute are located, was included in the 1,500 properties conveyed in the sale. On August 11, 1992, ARCO and Aviva/Columbine (hereinafter "Columbine") entered into a Purchase and Sale Agreement ("PSA") for the royalty package.

On the date of the sale, ARCO and Columbine also entered into an Assignment and Conveyance Agreement ("Assignment"), which was made effective July 1, 1992. The "Granting and Habendum Clauses" of the Assignment provided, in pertinent part:

> [ARCO] hereby transfers, grants, bargains, sells, conveys, and Assigns to [Columbine], and the successors and Assigns of [Columbine] all of [ARCO]'s right, title, and interest in and to the following:
>
> (a) [ARCO]'s right, title, and interest in and to or derived under (i) the royalty interest reserved in favor of [ARCO] or its predecessor(s) in title, as lessor, in any oil and gas lease or oil, gas, and mineral lease in which [ARCO] or its predecessor(s) in title is the lessor and which covers property as described in Exhibit A hereto, or any part thereof or any interest therein; (ii) the royalty interest, non-participating royalty interest or non-executory mineral interest either granted to or reserved by any deed, grant, or conveyance in which [ARCO] or its predecessor(s) in title is either the grantor or grantee hereto, or any part thereof or any interest therein; (iii) each overriding royalty interest, net profit interest or other non-cost bearing interest either granted to or reserved by or in favor of [ARCO] or its

2

predecessor(s) in title in any assignment or conveyance in which [ARCO] or its predecessor(s) in title is either the assignor or assignee and which covers property as described in Exhibit A hereto, or any part thereof or any interest therein; and (iv) without limitation of the foregoing each royalty interest, overriding royalty interest, net profit interest or other non-cost bearing interest which has been unitized, communitized or pooled under unit, communitization, pooling or similar agreements, or under orders of state regulatory agencies, and which unitized, communitized or pool interest covers property as described in Exhibit A hereto, or any part thereof, or any interest therein, INSOFAR AND ONLY INSOFAR AS (but without limitation of the provisions of subsection (iv), above) each Royalty Interest covers or relates to the lands and other property described in Exhibit A under the heading "Description of Lands;"

(b) All of [ARCO]'s rights, titles, and interests in and to all units, pooled acreage, proration or spacing units, or other allocation of acreage established by, or in accordance with applicable state, federal, tribal, or local law, to the extent and solely to the extent that such rights, titles, and interests related to the interests described in Subsection (a) above;

(c) All of Assignor's right, title, and interest in and to all oil, gas, and other minerals produced from the interests described in Subsections (a) and (b) above subsequent to the Effective Time and all proceeds of such production.

***

Attached to the Assignment was a document entitled "Exhibit A,"

which described the subject property as follows:

| Field Name | Property Name | Intr Type | Description of Lands |
|---|---|---|---|
| Bethany | Talbert S F Unit ORR | UI | All of Section 18-T14N-R15W, containing 604.850 acres, as described more fully in Dept. of Conservation Order No. 289 dated 9-16-54. ARCO interest reserved in Assignment dated 7-16-54 from Southern |

3

| | | | Production Co. to Ralph R. Gilster. et al. recorded in Vol. 725, Pg. 269 of the Conveyance Book. |
|---|---|---|---|

Exhibit A also provided, in pertinent part:

PREAMBLE

1. Unless the context otherwise requires, all terms that are defined in the Assignment and Conveyance dated August 11, 1992, by and between [ARCO] and [Columbine] to which this Exhibit A is attached shall have the meanings stated in said Assignment and Conveyance.

*** 

3. This Exhibit includes the following headings:

***

Intr Type:    Interest Type

***

UI. A royalty interest, overriding royalty interest, net profit interest or other non-cost bearing which has been unitized, communitized or pooled under unit, communitization, pooling or similar agreements, or under orders of state or federal regulatory agencies.

***

Description of Lands: The description of the lands and depths included in the Royalty interests.  The description does not necessarily signify that ARCO owns the entire interest described or that ARCO owns such interest as to all depth intervals described.

***

4. Notwithstanding any provision thereof to the contrary, the Purchase and Sale Agreement to which this Exhibit A is attached is intended to and does cover any and all producing zones and/or formations underlying the lands described in this Exhibit A, without regard to any depth or formation restrictions set forth herein.  For purposes of the preceding sentence, a zone and/or formation shall be deemed to be "producing" to the extent, as of the Effective Date, (a) there is actual production of oil, gas and/or other hydrocarbons from such zone or formation, or (b) there is a well or wells located on the lands described in this Exhibit A which are completed to such zone or formation, but such well or wells are being reworked or are otherwise temporarily shut-in.

4

The conflict herein pertains to royalties on production of natural gas from the Haynesville Formation, which was unitized in 2009, approximately 17 years after the 1992 Agreement was reached. The Talbert Property is included in the Haynesville Formation. Columbine asserts that the 1992 Agreement includes the disputed interest in the Haynesville Formation, while BP/ARCO maintains the 1992 Agreement includes only the zones that were producing in 1992.

Not long after the parties entered into the PSA/Assignment, disputes began to arise with regard to who owned what properties and who was entitled to certain royalties. Pertinent to this matter, both Columbine and BP/ARCO claimed to own the disputed interest in the royalties in the Talbert Property. According to BP/ARCO, the term, "UI," listed beneath the caption "Intr Type" denotes the type of interest being conveyed, *i.e.*, only the unitized interest. Therefore, BP/ARCO claimed that it never conveyed the interests that were not unitized or producing at the time of the sale. Columbine argued that BP/ARCO never limited the transaction to the producing units. Columbine asserted that the "UI" term was used to indicate that the interest being sold was unitized, and the interest being conveyed was described under the "Description of Lands" heading. Further, according to Columbine, in the cases where BP/ARCO intended to limit the sale, such as depth or formation limitations, it did so under the "Description of Lands" heading.

When the dispute arose, Goodrich filed the instant concursus proceeding and deposited the funds into the registry of the court. The parties filed cross motions for summary judgment, which were denied. The matter proceeded to trial during which the parties agreed that ARCO prepared the

5

Assignment, and Paragraph 4 was prepared by the attorney representing Columbine.

Multiple witnesses testified at trial and via depositions. Kevin Preston, the Vice-President of Aviva, testified that he was a petroleum reservoir engineer, and he had been involved in the "economic analysis of and property evaluation of oil and gas properties" for approximately 40 years. He stated that he had "screened hundreds" of sales packages in preparation for the acquisition of oil and gas properties. With regard to the Talbert Property, Preston described his understanding of the PSA/Assignment as follows:

> In this case, we would get ARCO's right[s], title and interest in the tracts in Section 18 that ARCO owned. We would get those as to all depths and all formations. And as to any formations that had been unitized – in this case it was the Pettit. We would get that too. So we would have – that zone that had been unitized so ARCO was getting revenue and we would be getting revenues from wells that potentially weren't even on ARCO acreage. It had been unitized.
>
> ***
>
> [The agreement] says we got the royalty and overrides associated with those lands . . . and the description of the lands is not limited. I mean there are many cases where they went on to say, "Limited to the Pettit or limited to the Crane or limited to the Hosston or limited to the unitized formation." But the SF Talbert property, it doesn't say that.
>
> ***

Preston also testified as follows: the Assignment did not "create an interest for anyone other than Columbine"; the property descriptions and the Assignment were prepared by ARCO; Paragraph 4 was prepared by the attorney for Columbine and was added because Columbine had discovered that several wells had depth limitations that had been depleted; and there

6

was no language in Paragraph 4 that would limit the conveyance to "only producing zones" because the document does not use the word "only." Preston stated:

> And in this case the phrase is, "The purchase and sale agreement is intended to and does cover all producing zones." So that's a true statement. It covers all producing zones. It would apply only where you had other wording in this document that was contrary to us getting producing zones. And that only occurs in the handful or, you know, the few examples where a property was limited and the well had been recompleted to a zone outside of those limitations. Otherwise, we were already getting all producing zones.
>
> ***

Preston reiterated that there was no intent by Columbine to limit the conveyance to only producing zones. He testified as follows: the language in Paragraph 4 "was an expansion of rights that were already granted"; in instances where sellers opt to reserve certain royalties or interests, the language is "very explicit" and "very clear" and is "typically put in bold print"; ARCO's assertion that "UI" meant that the only thing being conveyed was the interest in the unit was incorrect; "UI" was used to indicate that the property had been unitized and that there were "no restrictions to the unitized zone";[2] Columbine was being paid royalties on multiple properties with a "UI" designation, including at least one on the Talbert property; and the other "UI" well on the Talbert Property was being

---

[2] Preston stated:

> You know, I have counted these up. There are over 278 UI types interests in this Assignment. And 175 of those are limited, further limited. It goes on – even though it's described as a unit, it may cite a unit order, there's language in there that says, "Limited to the Pettit. Limited to the Hosston. Limited to the unitized formation." And there are 103 of these UI type interest that don't have any. And these are approximate numbers.

7

drilled by a different drilling operator, and there had never been a question as to who should receive the royalty payments.[3]

Andrea Pollack, the Founder and President of Aviva, testified that she was never informed that ARCO was conveying overriding royalty interests only in the producing zones. She also testified that Columbine intended to purchase all zones/formations, producing and non-producing, for the 1,500 properties. Pollack stated that she had purchased at least 12 royalty packages prior to the 1992 deal, and the benefit of purchasing such packages is the potential for additional drilling, new discoveries, and new technology. According to Pollack, the ARCO package included "a widespread of producing and non-producing royalties, some of which included depth limitations and others which did not." She reiterated that she was sold both producing and non-producing zones, and she was never informed that ARCO only intended to sell only producing zones or revenue streams. Pollack also stated that she had never bid on a "revenue-stream-only" deal, and she would never do so.

James M. Perkins, Jr., was employed by ARCO as its manager of acquisitions and divestiture from 1985-1993. He testified that the statements made in the Brochure were "true and accurate." Notwithstanding that assertion, Preston testified that ARCO's intention was to limit the royalties being sold to the "current producing" revenue stream, while retaining rights "where applicable." He stated that ARCO attempted to prepare the property descriptions to "maximize ARCO's retention of any future potential of the

---

[3] Preston was recalled to testify as a rebuttal witness. He stated that it would not have been too expensive to ARCO to limit the sale of the properties to "producing zones only."

8

properties"; however, ARCO did not employ enough people to prepare accurate descriptions of the properties. Perkins testified that "it was an economic decision by ARCO as to whether they wanted to spend the money and manpower to make sure, for a particular piece of property, it was limited to a producing interval." According to Perkins, ARCO decided that it was not economically feasible to obtain title opinions on each of the 1,500 properties it sold to Columbine.

Kay O'Brien testified that she was employed by ARCO as a business consultant for 22 years. She described her job as "kind of the liaison between accounting and land." She stated that she was not "involved in" the royalty package deal. However, as the business consultant, she "attended most of the meetings" regarding the royalty package to "kind of observe and listen" to "make sure the accounting needs were going to be met." O'Brien stated that it was her understanding that the wells being conveyed in the royalty package were the ones "that were producing."

James Grover testified that he was employed by ARCO as a division order analyst and was "responsible for determining ownership in a well, and maintaining ownership over the life of the well to facilitate the payment of royalties." He stated that he reviewed records for operated and non-operated properties, and "it was more difficult to determine non-operated" ownership interests. Grover testified that the "overall quality" of the records in this case was "poor," due, in part, to the numbers, types, and locations of entities from which ARCO acquired the properties. Grover also testified that although he was not involved in preparing, marketing, or negotiating the royalty package, he was "familiar with" the PSA/Assignment. He stated that

9

after the transaction was finalized, he worked with Columbine "to transition payments that were previously coming to ARCO over to them."

Mark Landt testified that he was employed by ARCO from 1976-2000. He stated that he worked as the "land and negotiation manager" and was "involved in" the royalty package deal.[4] He testified as follows: ARCO drafted the property descriptions "to limit the sale to the current producing interval and spacing unit, insofar as we had the knowledge to do so"; "if the producing interval could not be described, the description was limited to the royalty interests ARCO retained under the farmout assignment or lease"; during the process of preparing the property descriptions, ARCO was aware of "some issues" with regard to "properly describing" the producing formation for the non-unitized tracts; ARCO intended to sell only the currently producing interests, while retaining the remaining rights "where applicable"; the "legal descriptions of the royalties to be sold were written so as to describe as closely as possible only those lands currently in producing units or allocated to producing wells"; ARCO prepared the descriptions "to maximize ARCO's retention of any future potential of the properties"; and the property descriptions prepared by ARCO were "ambiguous."

John Sansbury testified as a paid consultant for ARCO. He testified that in 1992, he was employed as ARCO's land manager and was responsible for closing the sale to Columbine. Sansbury testified that ARCO was aware that the property descriptions were "not necessarily accurate in all regards," and he described ARCO's internal files as "sketchy at best" and "inaccurate." With regard to Paragraph 4 of the Assignment, Sansbury

---

[4] Landt testified that he was transferred to a different position prior to the execution of the agreement in dispute.

stated that the paragraph was prepared by the attorney for Columbine because Columbine "wanted to make sure that they received the producing formation zones that they were entitled [to]." He admitted that Paragraph 4 did not use the word "only" to indicate that the sale was limited to the then-producing zones.

Randolph Kelly Green testified as an expert in petroleum engineering, with an emphasis on reservoir evaluations. Green stated that he was employed by Netherland, Sewell and was involved in preparing the ARCO reserve estimates, but he was not involved in negotiating the PSA and Assignment. He stated that Netherland, Sewell was asked to evaluate producing and non-producing reserves on behalf of ARCO. Green also testified that ARCO did not indicate that the royalty package was limited to a revenue stream from producing properties or zones, and he was not told to limit his evaluation to producing zones only. Green stated that if the sale had been limited to producing zones only, he believes ARCO would have told him to exclude non-producing reserves from the evaluation. He stated, "We were asked to evaluate proved developed producing reserves and proved developed non-producing reserves at the time."

Gary Hoff testified via deposition. He stated that he was employed by ARCO from 1973-1993. He testified that he was involved in the preparation of the PSA and Assignment, but he had never seen the Brochure. Hoff stated that ARCO decided to sell producing zones only, and Aviva was aware of that decision. He admitted that he had never seen a written document indicating that ARCO was selling only producing zones. Hoff stated that the only language indicating that the sale was limited to

11

producing zones was the language set forth in Paragraph 4 of the Assignment.

John Moore, who was employed by ARCO in its acquisition/divesture division, also testified via deposition. He testified as follows: he was involved in the attempt to sell the properties in 1988, and the subsequent sale in 1992; he approved the Brochure, and he believed the information included therein was accurate; the Brochure was designed to market for sale the "upside potential" of future productive or non-producing zones for the properties; the Brochure referenced producing zones and "potentially producing zones"; the Brochure indicated that potential bidders could make their own estimate of additional potential, and that additional potential would include non-producing zones; when the Brochure was updated prior to the 1992 sale, the list of properties was changed; the bid instruction letter did not contain any reference that only producing zones were being sold; a letter written to Kevin Preston regarding the royalty package did not indicate that the term "UI" meant that only the interests in unitized formations were being sold; he did not recall ARCO changing the scope "of what was being sold to exclude from the sale all non-producing zones"; he believes the bidders would have been notified in writing if ARCO had decided to limit the sale to producing zones only; if ARCO had intended not to convey a certain interest to Columbine, "it would seem" that ARCO would have made the reservation in writing; "according to the English language," Paragraph 4 did not state that only producing zones were being sold; ARCO could have specifically stated that the sale was being limited to producing zones only "if they wanted to"; and there was "some lack of clarity" in the language of the agreement.

Moore also confirmed internal correspondence he prepared in 1988 and 1992 with regard to the Brochure and the potential sale. In comparing a memorandum he prepared in 1988 to one that he prepared in 1992, Moore testified that the properties were being described "to limit the sale to the current producing interval and spacing unit, insofar as we had the knowledge to do so." During Moore's deposition testimony, the colloquy was as follows:

> Q. And that's in your April 29, 1992, memo. If you look back at the August '88 one, it says, "The legal descriptions of the royalties to be sold were written . . . so as to describe as closely as possible only those lands currently producing units or allocated to producing wells.
>
> A. Similar.
>                              ***
> Q. Next sentence says, "If the producing interval could not be described, the description was limited to the royalty interests ARCO retained on the farmout assignment or lease." Do you see where it says that?
>
> A. I see that.
>
> Q. That's ultimately what happened, right? In the property description. If it could not be limited to a producing interval, then it was – the description was simply limited to the royalty interests ARCO retained under the farmout assignment or lease?
>
> A. Again, it would appear to be[.]
>                              ***

After hearing the testimony and reviewing the evidence, the trial court found as follows: (1) Texas law applies, pursuant to the agreement of parties; (2) Paragraph 4 of Exhibit A "expands the Assignment to include zones which were producing as of July 1, 1992, notwithstanding the depth limitations included in the property descriptions . . . and does not limit the overriding royalties conveyed by the Assignment to only producing zones as of July 1, 1992"; (3) the "Description of Lands" for the Disputed Interest

13

does not contain any limitation to a zone or formation; (4) the inclusion of "UI" in the column "Intr Type" for the Disputed Interest does not operate to convey an interest only in a unitized formation; and (5) Columbine is entitled to all overriding royalties attributable to the Disputed Interest.

BP/ARCO appeals.

## DISCUSSION

BP/ARCO contends the trial court erred in its interpretation of the contract. According to BP/ARCO, the inclusion of the term "UI" beneath the "Intr Type" column of the property description operated to convey an interest only in a unitized formation, and the trial court erred in finding otherwise. BP/ARCO argues that the property description makes it clear that the "interest type" that ARCO conveyed to Columbine was the "UI," *i.e.*, the unitized interest, and the Pettit/Hosston Formation was the only unitized, producing interest on the property at the time the parties entered into the PSA/Assignment. BP/ARCO maintains that the Haynesville Formation did not come into existence until 2009; therefore, ARCO clearly did not intend to transfer the then-nonexistent unitized interest in the Haynesville Formation.

Columbine, on the other hand, contends the interest being conveyed was described under the "Description of Lands" heading of the agreement, and the term "UI" was used to indicate that the property being sold had been unitized. Further, according to Columbine, in the cases where BP/ARCO intended to limit the sale, such as depth or formation limitations, it did so under the "Description of Lands" heading. Columbine notes that BP/ARCO did not place any limitations or restrictions on the property being conveyed in this case.

14

We note that the trial court conducted a choice of law analysis and determined that Texas law applies to this matter, pursuant to the forum selection provision in the contract.[5] Neither party appealed the trial court's determination. Therefore, that ruling is final, and this Court shall apply Texas law to this matter.

Texas law, with regard to contracts and contract interpretation, provides as follows:

> Contracts are reviewed under a *de novo* standard of review. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W. 3d 471 (Tex. 2019).
>
> Absent ambiguity, contracts are construed as a matter of law. *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W. 3d 296, 305 (Tex. 2015); *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W. 3d 1, 7 (Tex. 2014). In construing a written contract, our primary objective is to ascertain the parties' true intentions as expressed in the language they chose. *Id.* Contracts are construed from a utilitarian standpoint, bearing in mind the particular business activity sought to be served, and avoiding unreasonable constructions when possible and proper. *Plains Expl.*, *supra*; *Reilly v. Rangers Mgmt., Inc.*, 727 S.W. 2d 527, 530 (Tex. 1987). To that end, the courts consider the entire writing, harmonizing and giving effect to all the contract provisions so that none will be rendered meaningless. *Plains Expl.*, *supra*; *Moayedi*, *supra*. No single provision taken alone is given controlling effect; rather, each must be considered in the context of the instrument as a whole. *Id.* Additionally, words are given their plain, common, or generally accepted meaning unless the contract shows that the parties used words in a technical or different sense. *Id.*
>
> A contract is not ambiguous if the contract's language can be given a certain or definite meaning. *Plains Expl.*, *supra*; *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W. 3d 802 (Tex. 2012). But if the contract is subject to two or more reasonable interpretations after applying the pertinent

---

[5] La. C.C. art. 3540 allows contracts to be governed by the law expressly chosen or clearly relied upon by the parties. A choice of law provision in a contract is presumed valid until it is proved invalid. *Daniels v. Int'l Paper Co.,* 51,633 (La. App. 2 Cir. 11/3/17), 245 So. 3d 180, *writ denied*, 18-0236 (La. 3/23/18), 239 So. 3d 295; *Barnett v. American Const. Hoist, Inc.*, 11-1261 (La. App. 1 Cir. 2/10/12), 91 So. 3d 345. *See also Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W. 3d 428 (Tex. 2017); *In re Laibe Corp.*, 307 S.W. 3d 314 (Tex. 2010)

construction principles, the contract is ambiguous, creating a fact issue regarding the parties' intent. *Id.*

While extrinsic evidence of the parties' intent is not admissible to create an ambiguity, the contract may be read in light of the circumstances surrounding its execution to determine whether an ambiguity exists. *Plains Expl.*, *supra*; *El Paso Field Servs.*, *supra*; *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W. 2d 738, 741 (Tex. 1998). Consideration of the surrounding facts and circumstances is simply an aid in the construction of the contract's language and has its limits. *Plains Expl. & Prod. Co.*, *supra*; *Sun Oil Co. v. Madeley*, 626 S.W. 2d 726, 731 (Tex. 1981). The rule that extrinsic evidence is not admissible to create an ambiguity "obtains even to the extent of prohibiting proof of circumstances surrounding the transaction when the instrument involved, by its terms, plainly and clearly discloses the intention of the parties, or is so worded that it is not fairly susceptible of more than one legal meaning or construction." *Sun Oil Co.*, *supra*, at 732 (quoting *Lewis v. E. Tex. Fin. Co.*, 136 Tex. 149, 146 S.W. 2d 977, 980 (1941)). Mere disagreement over the interpretation of an agreement does not necessarily render the contract ambiguous. *Plains Expl. & Prod. Co.*, *supra.*

An ambiguous contract is strictly construed against the drafter. *Gonzalez v. Mission Am. Ins. Co.,* 795 S.W. 2d 734 (Tex. 1990); *Liberty Surplus Ins. Corp. v. Exxon Mobil Corp.*, 483 S.W. 3d 96 (Tex. App. 2015).

The arguments raised in this case implicate overlapping standards of review. As stated above, the interpretation of a contract is a question of law, to which courts apply a *de novo* standard of review. *Barrow-Shaver Res.*, *supra*; *MCI Telecomms. Corp. v. Texas Utilities Electric Co.*, 995 S.W. 2d 647 (Tex. 1999). Herein, the trial court entered written findings of fact and conclusions of law. Findings of fact made by the trial judge, sitting as the factfinder, enjoy the same status as findings of a jury. *Texas Outfitters Ltd., LLC v. Nicholson*, 572 S.W. 3d 647 (Tex. 2019); *Anderson v. City of Seven Points,* 806 S.W. 2d 791 (Tex. 1991). Therefore, a trial court's fact findings are reviewed by the same standards used to review the sufficiency of the evidence to support a jury's findings. *Hegar v. Am. Multi-Cinema, Inc.*, 605

S.W. 3d 35 (Tex. 2020), *reh'g denied* (Aug. 28, 2020); *Catalina v. Blasdel*, 881 S.W. 2d 295 (Tex. 1994).

In the instant case, in ruling in favor of Columbine, the trial court reviewed the documentary evidence and summarized the testimony in its entirety. The trial court considered the intent of the parties and concluded that the parties did not intend the PSA and Assignment to be limited only to the zones that were producing at the time of the agreement. The court stated, in pertinent part:

*** 

> Here, the parties presented ample evidence of their respective intent when entering into the PSA and Assignment. What is most interesting to the Court is that, with few exceptions and despite the diametrically opposed positions the parties have taken, the intent evidence is largely consistent. With respect to the Disputed Interest, all parties agree that it is a "grouped" property. It was uncontested that the "grouped" properties generated less income for ARCO, received less attention from ARCO, and Netherland, Sewell conducted less analysis of the "grouped" properties as opposed to the "major" properties for purposes of the Brochure and 1992 update.

> Ms. Pollack and Mr. Preston both testified explicitly and convincingly that ARCO solicited bids on producing and non-producing zones via the Brochure and that Aviva/Columbine intended to and, in fact, did bid upon and purchase producing and non-producing zones. They also testified that Paragraph 4 was prepared by Aviva/Columbine's attorney, Ms. Lynch, to expand the Assignment to include producing zones which would have otherwise been excluded due to depth limitations found in some Exhibit A property descriptions.

> On behalf of BP/ARCO, Mr. Perkins and Mr. Moore testified that the statements made in the Brochure were true and accurate. Mr. Moore further testified that he does not recall ARCO changing the scope "of what was being sold to exclude from the sale all non-producing zones" in 1992, and, if ARCO had done so, he believes the bidders would have been notified in writing. All BP/ARCO witnesses testified consistently that ARCO did not notify potential bidders, particularly Aviva, in writing of ARCO's intention to exclude all non-producing zones from the royalty package. Additionally, all BP/ARCO

17

witnesses confirmed that ARCO's royalty records, including property descriptions, were largely inadequate and inaccurate.

***

The court further stated, in pertinent part:

Now having the benefit of considerable witness testimony, the Court finds the parties intended Paragraph 4 to expand the property descriptions to provide an additional basis of royalty for Columbine's benefit. Specifically, the parties intended Paragraph 4 to expand the Assignment to include zones which were producing as of July 1, 1992, notwithstanding the depth limitations included in the property descriptions. The Court finds that Paragraph 4 does not limit the overriding royalties conveyed by the Assignment to only producing zones as of July 1, 1992. In making these findings, the Court notes that all of Columbine's and BP/ARCO's witnesses agree that ARCO's property descriptions were problematic. Further, BP/ARCO witnesses confirmed that ARCO made the business decision not to spend the time and money necessary to prepare accurate property descriptions. Instead, ARCO made the economic decision, which was internally acknowledged and accepted, "to limit the sale to the current producing interval and spacing unit, *insofar as [ARCO] had the knowledge to do so*." To the extent that the producing zone could not be described, ARCO made the business decision to limit the property description "*to the royalty interests ARCO retained under the farmout assignment or lease*." With respect to the Disputed Interest, the property description was limited, just as ARCO envisioned and intended, to the royalty interests ARCO retained under that certain Assignment, dated July 16, 1954, from Southern Production Co. to Ralph R. Gilster, *et al.*

***

Further, no credible testimony supported BP/ARCO's contention that inclusion of "UI" in the column "Intr Type" on Exhibit A operated to convey an interest only in a unitized formation. Accordingly, the Court finds that the Disputed Interest did not include a depth limitation beyond that which may be contained in the Assignment, dated July 16, 1954, from Southern Production Co. to Ralph R. Gilster, *et al.* Further, the Court finds that Columbine is entitled to all overriding royalties attributable to the Disputed Interest.

***

With respect to the PSA, Assignment, and events surrounding the negotiation and execution of the same, the Court makes the following additional observations. The Court found Ms. Pollack and Mr. Preston to be credible witnesses. The Court believes that Ms. Pollack testified truthfully that Aviva has never and would never bid upon or purchase a revenue stream only. In addition, the Court believes that Aviva/Columbine was never advised by ARCO or its employees that ARCO intended

18

the royalty package to be a revenue-stream-only or producing-zones-only deal. To the extent that ARCO intended to convey producing zones only, despite inclusion of property descriptions containing to depth limitation, that intention was not revealed to Aviva. "A secret or undisclosed intention of the grantor not to divest himself of title will not prevent a duly executed and delivered deed from taking effect." *Adams v. First Nat. Bank of Bells/Savoy*, 154 S.W. 3d 859, 870 (Tex. App. 2005).

(Emphasis in original).

After conducting a thorough *de novo* review of this record, we agree with the conclusions of the trial court. Both parties to the contract have diverging views regarding the interest being conveyed in the PSA/Assignment. The contradictory positions make it clear that the contract is "subject to two or more reasonable interpretations," and the parties' intentions cannot be clearly ascertained solely from the language of the PSA and Assignment. Therefore, the contract is ambiguous, and the trial court correctly interpreted the language of the contract "in light of the circumstances surrounding its execution." *See Plains Expl.*, *supra*.

Of necessity, this Court must analyze the trial court's findings concerning the circumstances surrounding the execution of the contract. We find the trial court's most thorough analysis, and conclusions drawn therefrom, reflected no error.

Notwithstanding BP/ARCO's contention, we cannot give controlling effect to the term "UI" without considering that term in the context of other provisions of the contract. In constructing the contract for the sale of the properties, ARCO defined "Description of Lands" as "the description of the lands and depths included in the Royalty interests." The "land" described in the contract under the heading "Description of Lands" was as follows:

> All of Section 18-T14N-R15W, containing 604.850 acres, as described more fully in Dept. of Conservation Order No. 289 dated 9-16-54. ARCO interest reserved in Assignment dated 7-16-54 from Southern Production Co. to Ralph R. Gilster, et al.

Further, paragraph (a)(iv) of the Granting Clause states, in part: "each Royalty Interest covers or relates to the lands and other property described in Exhibit A under the heading 'Description of Lands'[.]"

There is nothing in the language of the agreements to indicate that ARCO intended to reserve for itself any zones that were not producing as of the date of the sale.

Likewise, the PSA and the Assignment are devoid of any language that would have put Aviva/Columbine on notice that ARCO intended to sell only the interests that were producing at the time of the sale.

Furthermore, the testimony clearly established that ARCO was the drafter of the PSA. Thus, any ambiguity in the contract, under Texas law, must be strictly construed against ARCO. *See Gonzalez v. Mission Am. Ins. Co., supra*; *Liberty Surplus Ins. Corp., supra*.

Moreover, the testimony was lengthy regarding the parties' intentions. Pollack and Preston testified that ARCO provided no indication of its intent to sell producing zones only, and Columbine would not have placed a bid had ARCO done so. Although many of the witnesses testifying on behalf of ARCO maintained that ARCO intended to sell only the zones that were producing at the time of the sale, they agreed that the PSA and Assignment did not specify that only producing zones were being sold. The witnesses admitted that had ARCO intended to reserve non-producing zones, the intention should have been made clear in the written agreement.

20

In particular, Landt, who was instrumental in negotiating the royalty package deal on ARCO's behalf, testified that ARCO attempted to prepare the property descriptions to limit the sale to the units that were currently producing "insofar as we had the knowledge to do so." Nevertheless, Landt went on to state, "If the producing interval could not be described, the description was limited to the royalty interests ARCO retained under the farmout assignment or lease."

Sansbury also played a pertinent part for ARCO in the royalty package deal. He described the property descriptions as "sketchy" and "inaccurate," and he admitted that Paragraph 4 did not use the word "only" to indicate that the sale was limited to the then-producing zones.

Green testified that ARCO asked Netherland, Sewell to evaluate both production and non-producing reserves. Green stated that if ARCO had intended to limit the sale to producing zones only, he believes ARCO would have told him to exclude non-producing reserves from the evaluation.

Moore, who approved the Brochure and was involved in negotiating the agreement, admitted that ARCO advertised both producing zones and potentially producing zones. He stated that he did not recall ARCO changing the scope "of what was being sold to exclude from the sale all non-producing zones," and he believed the bidders would have been notified in writing if ARCO had decided to limit the sale to producing zones only. Further, Moore testified that Paragraph 4 did not state that only producing zones were being sold, and ARCO could have specifically stated that the sale was being limited to producing zones only "if they wanted to."

Based on our review of this record, we find that the trial court did not err in finding that the "Description of Lands" for the Disputed Interest does

21

not contain any limitation to a zone or formation, and the inclusion of "UI" in the column "Intr Type" for the Disputed Interest does not operate to convey an interest only in a unitized formation. As the trial court so aptly stated, "[N]o credible testimony supported BP/ARCO's contention that inclusion of 'UI' in the column 'Intr Type' on Exhibit A operated to convey an interest only in a unitized formation." Consequently, we find no error in the trial court's determination that Columbine is entitled to all overriding royalties attributable to the Disputed Interest.

## CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed. The costs of this appeal are assessed to the defendants, Atlantic Richfield Company and BP America Production Company.

**AFFIRMED**.